UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WALTER LEE JONES-BEY,

      Plaintiff,

                              Case No.  05-72817

v.                            District Judge Denise Page Hood
                              Magistrate Judge R. Steven Whalen

MICHIGAN DEPARTMENT OF CORRECTIONS,
*et al.*

      Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff, a prisoner in the custody of the Michigan Department of Corrections (MDOC) at Bellamy Creek correctional Facility (IBC) in Ionia, Michigan, filed a complaint on July 19, 2005, alleging that Defendants violated his First and Fourteenth Amendment rights in the March 30, 2004 issuance of Director's Office Memorandum (DOM) 2004-8, limiting prisoners' access to Uniform Commercial Code (UCC) material.  Before this Court is Defendants Patricia Caruso, Jan E. Trombley, and Linda Matuszaks' Fed. R. Civ. P. 56(b) motion for summary judgment which has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that the motion [Docket #15] be GRANTED as to Defendants Caruso, Trombley, and Matuszak in their personal capacity.  Further, I DENY Defendants' motion to the extent that they have

requested dismissal of Plaintiff's request injunctive relief against them in their official capacities, recommending that the district court issue a temporary restraining order enjoining enforcement of MDOC PD 05.03.118(HH)(22).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, proceeding in forma pauperis, brings this action against Patricia Caruso, Director of the MDOC, Jan Trombley, Warden of the Saginaw Regional Correctional Facility (SRF), and Linda Matuszak, Record Office Supervisor at SFR. He alleges that DOM 2004-8, issued by Defendant Caruso on March 30, 2004, denying inmates access to "books, pamphlets, forms or other [UCC] material" violated his First Amendment rights. He concedes that the directive, which also forbids prisoners to use funds in their institutional accounts to obtain such material, was created to deter prisoners from filing fraudulent liens for the purpose of harassing prison staff, prosecutors, and judges. *Id*. at ¶¶8, 14.

Plaintiff, admitting that he currently possesses material referencing UCC regulations "unassociated with criminal or fraudulent activity," states that on February 10, 2005 he attempted to mail a request for "forms related to copyrighting and registering for trademarks (sic)" to Michigan's Secretary of State office. *Id.* at ¶¶16-17. He alleges that the envelope containing his request was returned to him on February 14, 2005, absent a postmark or other indication that it had been processed by the post office. *Id*. at ¶18. Plaintiff then contacted Defendant Matuszak, the record office/mailroom supervisor, asking for an explanation of why his outgoing mail had been confiscated without notice. *Id*. at ¶20. After failing to receive a response from Matuszak, Plaintiff completed and sent a Step I grievance to

Defendant Trombley who forwarded the form to the institution's grievance coordinator. *Id* at ¶¶23-24.  On March 4, 2005, pursuant to Policy Directive (PD) 03.02.130, the grievance was rejected on the basis that it challenged an administrative policy or procedure. *Id.* at ¶25. Plaintiff, admitting that he possessed UCC material recently deemed "contraband," completed a Step II grievance which was rejected on identical grounds. *Id*. at ¶¶26-28, 32. On March 30, 2005, Defendant Trombley approved Housing Unit Rule #45 which declared (like DOM 2004-8) that UCC material would be considered contraband. *Id*. at ¶31. Plaintiff's Step III grievance was denied. *Id.* at ¶37.

Plaintiff alleges that Defendant Caruso's DOM limiting prisoners' access to UCC material violates his First and Fourteenth Amendment rights to free speech and access to the courts.  He states that the directive is facially unconstitutional on the grounds of overbreadth and further, that Defendant Matuszak's application of the directive, which includes opening outgoing prisoner mail addressed to the Secretary of State's office (not expressly forbidden in the DOM) also violates his First and Amendment rights, and alleging that the directive and its application by Matuszak violated his due process rights.  He requests a declaratory judgment stating that the DOM 2004-8, Housing Unit Rule #45, and Matuszak's application of the DOM are unconstitutional, further requesting an injunction against Defendants from censoring outgoing mail and depriving inmates of access to UCC material. He also seeks compensatory and punitive damages against Defendants.[1]

---

[1]Although MDOC was named as a defendant in the original complaint, Plaintiff's *Amended Complaint* at ¶7 [Docket #26] states that the  "[t]he amended complaint has

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).  Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the

---

removed any reference reflecting the Michigan Department of Corrections (MDOC) as a defendant, " stating further that the injunctive relief sought against Defendants would be in their official capacities. *Id.*

record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III.  ANALYSIS

**A.  Mootness**

Defendants argue first that Plaintiff's claims for injunctive relief were rendered moot by MDOC Policy Directive 05.03.118(HH)(22) which superceded DOM 2004-8 on June 6, 2005. Citing *Kensu v. Haigh*, 87 F3d 172, 175 (6th Cir. 1996), they argue further that Housing Unit Rule #45 is mooted by Plaintiff's subsequent transfer to the Bellamy Creek Correctional Facility (IBC).

"There is no question that inmates retain many of the protections of the First Amendment, such as rights to free expression." *Bazzetta v. McGinnis* 430 F.3d 795, 804 (6th Cir. 2005); *Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878 (1989). Prisoners' First Amendment rights, while abridged, are not completely abnegated. "Prison walls do not form a barrier separating prison inmates from the protections of the

Constitution," *Thornburgh,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878 (1989); *Turner v. Safley,* 482 U.S., 78, 84, 107 S.Ct., 2254, 2259 (1987). However, "these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Id.* ; *Turner,* 482 U.S., at 85, 107 S.Ct., at 2259. Characterizing the balance of constitutional guarantees and legitimate penological interests as "two bookend principles," the Sixth Circuit observed that "it is clear that incarceration does not strip inmates of all constitutional protections." *Thompson v. Campbell,*  81 Fed.Appx. 563, 567 (6th Cir.2003)(internal citations omitted). However, because "the federal judiciary is particularly ill equipped to deal with the complex and intractable problems of prison administration, we generally defer to the judgments of prison officials in upholding regulations." *Id*.

Pursuant to *Turner, supra*, the regulation in question is appraised at a deferential level of scrutiny. Its reasonableness is assessed with attention to four factors: "first, whether the restriction bears a 'valid, rational connection' to the 'legitimate governmental interest put forward to justify it,' such that the "asserted goal is not so remote as to render the policy arbitrary or irrational," *Amatel v. Reno,* 156 F.3d 192, 194, 332 U.S.App.D.C. 191, 193 (D.C. Circuit 1998); *Turner,* at 89-90, 107 S.Ct. 2254; the second prong determines "whether inmates retain alternative means of exercising the circumscribed right, *id.; Turner,* at 90, 2254; third, the court must consider "the costs that accommodating the right imposes on other inmates, guards, and prison resources;" and fourth, whether there are alternatives to the regulation that 'fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.'" *Id.; Turner,* at 90-91, 107 S.Ct. 2254.

Defendants argue that the claim became moot at the time DOM 2004-8 was "superceded" by MDOC Policy Directive (PD) 05.03.118(HH)(22). However, this argument fails for a number of reasons. First, despite the fact that DOM 2004-8 is no longer effective, obviating the need for declaratory and injunctive action to stop the original directive, this alone does not moot Plaintiff's claim. As a general rule, "a change in departmental policy which constitutes the voluntary cessation of allegedly illegal conduct does not deprive a tribunal of power to hear and determine a case, i.e., it does not make the case moot." *Figel v. Overton*, 2006 WL 625862, *2 (W.D. Mich. 2006). *Figel,* reasons that "[t]here is a public interest in having the legality of a practice settled, which militates against a finding of mootness. Where the defendants have not admitted that the challenged activity is illegal or demonstrated conclusively that the wrong will not be repeated, the case cannot be considered moot." *Id.; citing to Monroe v. Bombard,* 422 F.Supp. 211, 215 n. 5 (S.D. New York 1976); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632-633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

Notably, present Defendants have not acknowledged that DOM 2004-8 infringes on prisoners' First Amendment rights. For the same reason, although Plaintiff has since been transferred from Saginaw Regional Correctional Facility (SRF), this fact does not prevent the Court from considering the constitutionality of MDOC Policy Directive 05.03.118(HH)(22) or Housing Unit Rule #45, implemented by SRF staff as a means of applying the restrictions found in DOM 2004-8.

Next, while Defendants characterize PD 05.03.118(HH)(22), which prohibits all incoming UCC material other than "[l]egal materials which set forth the statute or provide

-7-

a scholarly legal analysis of the UCC," as "superceding" the DOM 2004-8,the policy directive is more properly termed as a "codification" of the broad restrictions placed on UCC material first discussed in the 2004 DOM.  The policy directive (while of course omitting the commentary found in the DOM) states the same restrictions on incoming prisoner mail pertaining to the UCC.[2]   Finally, although *Figel* found that the plaintiff's request for *equitable* relief was moot (despite finding the existence of an ongoing case and controversy), this aspect of *Figel* is inapplicable to the present case.  Unlike here, where MDOC PD 05.03.118(HH)(22) *continues* to deny Plaintiff non-scholarly UCC material for used for legitimate purposes, the *Figel* court found that Figel's subsequent access to the religious material in controversy removed the need for injunctive or declaratory action. Since PD 05.03.118(HH)(22) continues to enforce the restrictions set out in the DOM, the  Court can consider Plaintiff's request for equitable relief.

### B.  MDOC PD 05.03.118(HH) 22[3]

Citing *Thornburg, supra*, 490 U.S. 407-409, 109 S.Ct. 1878-1879, Defendants argue

---

[2]*Defendants Motion for Summary Judgment,* Exhibit B indicates that after the release of DOM 2004-8, but before the implementation of the policy directive, Defendant Caruso issued DOM 2005-4 (also containing restrictions against UCC publications) which states that it supercedes DOM 2004-8.

[3]MDOC PD 05.03.118(HH) *Prohibited Incoming Mail* states that "[p]risoners are prohibited from receiving mail that is a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner.  Subsection 22 prohibits "[m]ail regarding actions that can be taken under the Uniform Commercial Code (UCC).  This does not include legal materials which set forth the statute or provide a scholarly legal analysis of the UCC.

that the policy directive which limits prisoners' access to statutory and "scholarly" UCC material is reasonably "related to a legitimate penological objective." *Motion for Summary Judgment* at 8-9. Defendants point out that the DOM 2004-8 and the subsequent policy directive were implemented in response to prisoners' abuse of UCC-related functions such as placing liens on the property of judges, prosecutors, and government employees involved in the inmates' criminal prosecutions and incarceration.

As noted, Policy Directive 05.03.118(HH)(22) and its precursor DOM 2004-8 were inspired by growing concern over prisoners' use of UCC material and forms as a means harassing individuals involved in their conviction. *See U.S. v. Gordon,* 2005 WL 2237640, *1 (S.D.Ga.2005) ("Defendants are employing a tactic often used by inmates and prisoners to harass those involved in their prosecutions-namely, the filing of baseless liens or UCC Financing Statements in the hopes of damaging the purported lien debtor's credit." *Id.*; *Hudson v. Caruso,* No. 1:05-CV-137, 2005 WL 1689640 (W.D.Mich. July 19, 2005); *United States v. Brum,* No. Civ. A 105CV110, 2005 WL 1606584 (E.D.Tex. July 1, 2005)). Following his conviction, a New York defendant recorded "false and invalid" UCC liens against the real and personal property of the Chief Judge of the Eastern District of New York, a government attorney, and the warden of a federal detention center. *U.S. v. Orrego* 2004 WL 1447954, *1 (E.D.N.Y. 2004). In *U.S. v. Martin,* 356 F.Supp.2d 621, 623 (W.D. Va.2005), a federal prisoner "named himself as secured party for a debt of $8,000,000.00 allegedly owed by" the Fourth Circuit's Clerk of the Court, along with three Fourth Circuit U.S. Court of Appeals judges. He attached similar liens to the property of three Bureau of Prison

employees for $100,000,000.00.

In *Ray v. Williams,* 2005 WL 697041, *7 (D.Or. 2005), the court noted that the "Redemptionist" or "sovereign citizen" movements had been active in producing and disseminating publications such as "Cracking the Code" and "One Man Out," apparently designed for the specific purpose of instructing "its readers seek to avoid legal and fiscal responsibilities and personal accountability through the preparation and submission of false and fraudulent UCC forms."

Pursuant to *Turner, supra*, Defendants have established that the policy directive was generated in response to a legitimate governmental interest in avoiding the potential havoc raised by UCC filing abuses. However, at step two of the *Turner* analysis, assuming the forbidden material is sought for legitimate purposes, the MDOC's directive prescribes denial of access to the full range of "non-scholarly" UCC publications without providing alternative means to exercise the right to access UCC publications for *lawful* purposes.

Of course, the denial of non-scholarly UCC material does not state an access-to-the-courts claim pursuant to *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Plaintiff has not alleged that the UCC material, which regulates commercial transactions, was needed to challenge his conviction, sentence or the conditions of his confinement. However, the ban on non-scholarly UCC publications invokes other First Amendment rights. The UCC governs a wide range of sophisticated procedures, including sales, leases, negotiable instruments, bills of lading, and investment securities. Only a small percentage of these procedures have been abused by prisoners. However, because of the

MDOC ban on "non-scholarly" UCC material, the possibility remains (depending on what "scholarly" means) that unsophisticated prisoners who have a legitimate interest and need for interpretive material are left with only statutes and treatises composed by and for lawyers.

For all practical purposes, the policy directive has left prisoners without alternative means to exercise a legitimate right. In *Ray, supra,* at \*6 -7, the court rejected the plaintiff's argument that he held a right to access publications clearly written for the purpose of teaching readers how to create illegal liens, cautioning that the plaintiff did not hold a right to obtain likewise subversive material. Significantly, the court found that the question at hand was "whether plaintiff has the right to access publications regarding the Uniform Commercial Code unconnected to the Redemptionist or Sovereign Citizen movement," noting that Oregon's policy directive did not contain a sweeping prohibition on legitimate publications. "No such publications appear to be prohibited by applicable ODOC mail rules."

In contrast, MDOC's far-reaching and ambiguous policy directive not only bans publications advocating illegal activities but forbids *all* access to non-statutory or non-scholarly UCC material. Oxford English Dictionary Online Edition (taken from second print ed.1989) defines scholarly as "[p]ertaining to, or characterizing, a scholar; befitting, or natural to, a scholar; learned, erudite." The policy directive in its existing form has the perverse effect of guaranteeing that the majority of non-attorney prisoners seeking to conduct or study legitimate UCC procedures will be limited to material beyond their comprehension level. Further, pursuant to the third step of the *Turner* analysis, accommodating the right to legitimate information by reworking subsection 22 of the policy directive does not impose

-11-

a meaningful burden on other inmates, guards, or prison resources.

Likewise, at step four Defendants fail to show that a more narrowly- tailored directive could not serve the same legitimate governmental interest without infringing on the rights of individuals seeking legitimate but "non-scholarly" material pertaining to the UCC.[4] I also note that the government interests are not particularly well-served by the directive in its present form. It does not follow that because a publication is "non-scholarly" it is created

---

[4] Although Plaintiff has framed his attack on the directive on basis of overbreadth (and I agree that it is overbroad) this alone is insufficient to find a constitutional violation. Overbreadth has little or no role "in civil litigation dealing with prisons' internal operations. Some open-ended quality is essential if a prison is to have any guidelines; it is impossible to foresee all literature that may pose a threat to safety and security." *Borzych v. Frank* 439 F.3d 388 (2006), 391 -392 (7th Cir. 2006)(internal citations omitted). However, the policy directive, which prohibits prisoners from receiving any UCC material besides statutory and "scholarly legal analysis," deeming all other UCC publications contraband (MDOC PD 04.07.112(E)1) lends itself to a "void-for-vagueness" analysis. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Bailey v. Carter,* 15 Fed.Appx. 245, 252, 2001 WL 845446, *4 (6th Cir. 2001); *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)(internal citations omitted). However, an individual " raising a facial attack must demonstrate that the regulation is impermissibly vague in all of its applications-including its application to his case." *Walker v. McCaughtry,* 141 Fed.Appx. 460, 462, 2005 WL 1515471, *2 (7th Cir. 2005); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The policy directive is impermissably vague. The only material it clearly permits is access to "scholarly" UCC publications treatises written for use and study by lawyers and law students. Does it include treatises written by a business professor at the University of Pennsylvania? Does it exclude *all* UCC-related government publications composed for layman use? Alternatively, if it were interpreted to include government publications, would publications written by non-profit organizations for *pro se* litigants be forbidden?

or can be used for illegitimate purposes.[5]  By the same token, scholarly commentary can be misused for unlawful ends.

### C.     Qualified Immunity[6]

Defendants also argue that they are protected from suit by qualified immunity. *Motion* at 11.   They maintain that DOM 2004-5 and the subsequently adopted policy directive amounts to a "reasonable restriction on inmates' First Amendment rights and provide adequate due process protections," *Id.* at 12.

Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), a governmental official is protected by qualified immunity unless the Plaintiff shows (1) that the Defendants violated a constitutional right, and (2) the right was clearly established to the extent that a reasonable person in the defendant's position would know that the conduct complained of was unlawful.  In *Higgason v. Stephens*, 288 F.3d 868, 876-877 (6th Cir.

---

[5] As discussed below, the alleged *application* of DOM 2004-8 Saginaw Regional Correctional Facility (SRF) staff is similarly vague and over broad.  Also, allegations that staff members opened Plaintiff's outgoing mail to the Secretary of State Office without notice state a clearly established violation.  However, since Plaintiff has alleged no personal involvement in the opening of his outgoing mail by either Trombley or Matuszak, that count of his claim fails on that basis.

[6] Defendants argue that their lack of personal involvement in the alleged violations mandate their dismissal.  I agree that Plaintiff has failed to allege that Matuszak was personally involved in the confiscation of his outgoing mail and is therefore subject to dismissal.  Further, Plaintiff cannot demonstrate that Matuszak's actions, even if he alleged personal involvement, were objectively unreasonable.  Although Caruso, Director of the MDOC, and Trombley, the warden of the institution,  were personally responsible for composing the DOM and implementing Housing Unit Rule #45, as discussed above, claims against them are subject to dismissal on the basis of qualified immunity.

2002), the Sixth Circuit set forth a three-part test to determine whether a government official is entitled to the defense of qualified immunity (1) was there a violation of a constitutionally protected right; (2) was that right clearly established at the time; and (3) has the plaintiff alleged and shown by sufficient evidence that what the official allegedly did was objectively unreasonable?

As discussed in Section B., Plaintiff's allegation satisfies the first prong of *Saucier*. Pursuant to *Turner, supra,* policy directive 05.03.118(HH) 22 in its present form does not permit inmates alternative means to access legitimate and understandable UCC material. Further, the directive could be rewritten without over-burdening prison resources. As noted above, banning non-scholarly publications is only tangentially related to the well-founded goal of denying access to subversive ones. For the same reasons, Housing Unit Rule #45, which reflects a Defendant Trombley's implementation of the directive, is impermissible.

However, despite the existence of a constitutional violation, claims against Defendants Caruso, Trombley, and Matuszak are dismissible on the basis that the rights violated by Housing Unit Rule #45 were not clearly established - nor were their actions objectively unreasonable.

> "[T]o find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. . . . For the decisions of other courts to provide such 'clearly established law,' these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Id*., 992 F.2d at 606-607.

-14-

At the time of this writing (after extensive research) this Court is unaware of any federal or state case law which explicitly holds that banning non-scholarly UCC-related publications states a constitutional claim. This alone makes claims against Caruso in her personal capacity subject to dismissal. Moreover, I note that in Defendant Trombley's case, she was enforcing Housing Unit Rule #45 - a policy formulated by her superiors. In addition to the fact that she could she be not be expected to know that she was enforcing an unconstitutional policy, to have refused an order by the director of the MDOC would have presumably placed her own position in jeopardy.

### D. Preliminary Injunction

In addition to Plaintiff's request for damages, he seeks a preliminary injunction, immediately enjoining enforcement of the policy directive in question. *Complaint* at 11. Generally, in determining whether to grant injunctive relief, a court must examine and weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002); *McPherson v. Michigan High School Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573.

Notwithstanding this balancing approach, however, the likelihood of success and irreparable harm factors predominate. Thus, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.").

Generally a plaintiff bears the heavy burden of demonstrating his entitlement to a preliminary injunction. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet , supra,* at 573. "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Thus, plaintiffs may not merely point to genuine issues of material fact which exist, but must affirmatively demonstrate their entitlement to injunctive relief.

### i. Likelihood of Success on the Merits

As discussed above, while I recommend that the dismissal of the claim against Defendants in their *personal* capacity, which would foreclose Plaintiff's claim for monetary damages, the policy directive as currently written impermissibly curtails inmate rights. If the district court accepts my position that the policy directive is unconstitutional, Plaintiff is

likely to achieve success on the merits.

### ii.  Irreparable Harm

Although the burden to show "irreparable harm" in the absence of immediate injunctive relief is quite heavy, "in those cases which involve First Amendment matters, the crucial inquiry is typically whether the plaintiff has demonstrated a substantial likelihood of success on the merits." *Hamilton's Bogarts, Inc. v. State of Mich.* 2006 WL 334278, *2 (E.D.Mich.2006); *Spoons v. Morckel,* 314 F.Supp.2d 746, 753 (N.D.Ohio 2004). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).  "The harm stems from the fact that people will be deterred from exercising their rights in the future." *Entertainment Software Ass'n v. Granholm* 404 F.Supp.2d 978, *983 (E.D.Mich.,2005); *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority ("SORTA,),* 163 F.3d 341, 363 (6th Cir.1998).

The right to injunctive relief based on First Amendment violations is not foreclosed to inmates."A prisoner is entitled to judicial relief for a violation of his First Amendment rights aside from any physical, mental, or emotional injury he may have sustained."*Rowe v. Shake,* 196 F.3d 778 (1999), 781 -782 (7th Cir. 1999).

### iii.  Substantial Harm and Public Interest

While the Plaintiff has demonstrated the likelihood of success on the merits, the Court must again consider the facts of this case when deciding whether issuing injunctive relief

would cause substantial harm to others. I agree with Defendants to the extent that the policy directive in dispute, which attempts to address the well-documented abuse of UCC procedures by inmates, should not be voided without anticipation that it will be immediately replaced with a narrower but effective directive which addresses the issue at hand. However, because it is within Defendant Caruso's discretion to issue a superceding Director's Office Memorandum, I do not anticipate that the void left by enjoinment of enforcement of Policy Directive 05.03.118(HH)(22) will remain unfilled.

## IV. CONCLUSION

I recommend, for the reasons stated above, that Defendants' motion for summary judgment [Docket #15] be GRANTED as to Defendants Caruso, Trombley, and Matuszak in their personal capacity. Further, I DENY Defendants' motion to the extent that they have requested dismissal of Plaintiff's request for injunctive relief against them in their official capacities, recommending that the district court issue a temporary restraining order enjoining enforcement of MDOC PD 05.03.118(HH)(22).

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R.  Steven Whalen
R.  STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  June 27, 2006

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 27, 2006.

                                      <u>S/G. Wilson</u>
                                      Judicial Assistant